UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

APRIL MCCASTER,

    Plaintiff,

v.

UNITED STATES OF AMERICA, LAUREN SWORDS, M.D., and MERCY HOSPITAL & MEDICAL CENTER,

    Defendants.

No. 14 CV 312

Judge Manish S. Shah

MEMORANDUM OPINION AND ORDER

In 2013, two pieces of plastic film were discovered in April McCaster's uterus. Believing that the plastic had been left there during a 2009 cesarean section, McCaster sued the medical staff involved in that procedure for ordinary negligence, negligence based on the doctrine of *res ipsa loquitur*, and (as to one defendant) violations of the Federal Tort Claims Act. The defendants moved for summary judgment. For the reasons discussed below, the motions are denied.

I.  **Legal Standard**

Summary judgment must be granted where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if the evidence is such that a reasonable trier of fact could return a verdict for the nonmoving party. *Kvapil v. Chippewa Cnty., Wis.*, 752 F.3d 708, 712 (7th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In reviewing a summary-judgment

motion, a court construes all facts, and draws all reasonable inferences from those facts, in favor of the non-moving party. *United States v. P.H. Glatfelter Co.*, 768 F.3d 662, 668 (7th Cir. 2014) (quoting *Laskin v. Siegel*, 728 F.3d 731, 734 (7th Cir. 2013)).

**II. Facts**

In February 2013, April McCaster went to Rush University Medical Center complaining of abdominal pain, heavy menstrual bleeding, and vaginal discharge. *See* [49] ¶ 5; [56] ¶ 5; [58] ¶ 11; [63] ¶ 11.[1] She brought with her the results of a recent ultrasound, which showed a calcified area in her uterus. *See* [58] ¶ 16; [63] ¶ 16; November 19, 2014 Deposition of Ranoo Sabnis, M.D., [49-2] at 13, Tr. at 12:8–:11. Dr. Ranoo Sabnis, a supervising physician in Rush's resident clinic, believed the calcified area might be due to an intrauterine device, and ordered an x-ray; but the x-ray revealed no IUD. *See* Sabnis Deposition, [49-2] at 11, Tr. at 10:4–:5; *id.* at 13, Tr. at 12:12–:13. Dr. Sabnis then performed several exploratory surgeries, and found two pieces of plastic film in McCaster's uterus. *See* [45] ¶ 25; [49] ¶¶ 6; [54] ¶ 25; [56] ¶¶ 5–6. Dr. Sabnis removed the plastic pieces—each about 8.4 cm long by 6.6 cm wide and .0076 cm thick, with a notch cut out of one corner—but did not see any markings on them and could not identify them. *See* [45] ¶ 25; [49] ¶¶ 6–7; [54]

---

[1] Bracketed numbers refer to entries on the district court's docket; referenced page numbers are from the CM/ECF header placed at the top of filings. The facts related in this opinion are taken from the parties' Local Rule 56.1 Statements of Undisputed Material Fact (and answers or exhibits thereto).

2

¶ 25; [56] ¶¶ 6–7; [58] ¶ 19; [63] ¶ 19; July 9, 2015 Report of Len Czuba, [49-7] at 4; *see also* [49-7] at 11:



Before Dr. Sabnis discovered and removed the plastic pieces in 2013, McCaster had undergone four operations in her abdominal area. In 2003 she had an emergency appendectomy at Fort Walton Beach Medical Center; in March 2004 she delivered a baby via cesarean section at Advocate Christ Hospital; in December 2005 she had an abortion at Stroger Cook County Hospital; and in March 2009 she had another C-section, this time at Mercy Hospital & Medical Center. *See* [45] ¶¶ 8, 13; [49] ¶¶ 8, 10–11, 15; [54] ¶¶ 8, 13; [56] ¶¶ 8, 10–11, 15.

During the 2003 appendectomy, the surgeon had used a plastic specimen bag to remove McCaster's appendix. *See* [45] ¶ 15; [49] ¶ 9; [54] ¶ 15; [56] ¶ 9. The bag was inserted in McCaster's abdomen, where a device like a purse string was used to close the bag around the infected appendix. *See* [45] ¶ 15; [54] ¶ 15; [58] ¶ 1; [63] ¶ 1; April 9, 2015 Deposition of William M. Haney, M.D., [49-3] at 44–45, Tr. at

22:12–:19. McCaster had no complications following the appendectomy—no pain, no bleeding, and no abnormal discharge—and experienced no gynecological problems leading up to her first pregnancy later that year. *See* [58] ¶¶ 3–4; [63] ¶¶ 3–4; Haney Deposition, [49-3] at 60, Tr. at 30:10–:13; October 24, 2014 Deposition of April McCaster, [49-1] at 9, Tr. at 30:20–31: 23.[2]

McCaster gave birth to her first child, via C-section, at Advocate Christ Hospital in March 2004. *See* [49] ¶ 10; [56] ¶ 10. A few days after her release from Advocate, McCaster went to the emergency room at the University of Chicago Medical Center, complaining of fever, "feeling woozy," and abdominal pain (though, at the time of her deposition in 2014, McCaster did not recall having felt any abdominal pain when she went to the emergency room in 2004). *See* [58] ¶ 5; [63] ¶ 5; McCaster Deposition, [49-1] at 11–12, Tr. at 40:15–41:13. Doctors at the University of Chicago performed a vaginal exam, and found pus or other discharge indicative of an infection. *See* [49-1] at 12, Tr. at 41:14–:21. They referred McCaster back to Advocate, where she was admitted for several days and treated for the infection. *See id.*, Tr. at 42:5–:12; September 21, 2015 Deposition of Fred J. Duboe, M.D., [49-11] at 52, Tr. at 202:6–:14. McCaster left Advocate (for the second time) with no pain or abnormal discharge. *See* [58] ¶ 5; [63] ¶ 5; McCaster Deposition, [49-1] at 12, Tr. at 43:5–:11.

---

[2] The government disputes that McCaster had no complications from the appendectomy, but agrees that her medical records reflect no complications during the post-operative period. *See* [63] ¶ 3.

McCaster returned to Advocate in July 2005 with complaints of vaginal bleeding and moderate abdominal pain, though by the time she arrived at the hospital, both the pain and bleeding had lessened. *See* July 27, 2005 Christ Hospital Emergency Record, [63-1] at 2–3. Notes prepared by hospital staff indicate that McCaster had discontinued her birth control several weeks before her visit in July. *See id.* at 3.

McCaster became pregnant for a second time in 2005, but terminated the pregnancy in December of that year. *See* [49] ¶ 11; [56] ¶ 11. She had no pelvic or abdominal pain after the abortion. *See* [58] ¶ 6; [63] ¶ 6. Medical records from February 2006 reflect that, by that time, McCaster had resumed birth control and was experiencing some spotting, *see* February 9, 2006 Adult Encounter Form, [63-1] at 8, though McCaster does not recall having had any gynecological problems or concerns between 2004 (when she had her first C-section) and when she again became pregnant (for a third time) in 2008, *see* McCaster Deposition, [49-1] at 13, Tr. at 47:7–:11; [49] ¶ 12; [56] ¶ 12.[3]

During her third pregnancy, McCaster received prenatal care at Friend Family Health Center, a federally-funded health clinic. *See* [45] ¶ 9; [49] ¶ 13; [54] ¶ 9; [56] ¶ 13. Dr. Kathy Jones—who has been deemed a federal employee for the purposes of this litigation—was among the physicians who treated McCaster at the

---

[3] Relying on a gynecology record from 2007, the government claims that McCaster also suffered from vaginal discharge in December of that year. In the "Assessment" portion of the record are the words "vag d/c," next to a " < " symbol and the phrase "BV [unintelligible]." What is meant by this notation cannot be determined from the document itself, and no explanation is otherwise provided. *See* [63-1] at 9.

5

clinic. *See* [49] ¶¶ 13–14; [56] ¶¶ 13–14. Dr. Jones scheduled McCaster for a C-section on March 25, 2009, at Mercy Hospital & Medical Center. *See* [45] ¶ 10; [49] ¶ 15; [54] ¶ 10; [56] ¶ 15. Three ultrasounds were performed in the meantime, but none of the ultrasound reports indicated the presence of a foreign body in McCaster's uterus. *See* [58] ¶ 8; [63] ¶ 8.

Dr. Jones and Dr. Lauren Swords, a resident at Mercy Hospital, performed the C-section on March 25, 2009. *See* [45] ¶¶ 3, 17; [49] ¶ 15; [54] ¶¶ 3, 17; [56] ¶ 15. They were assisted during the procedure by a scrub nurse and circulating nurse. *See* [45] ¶ 18; [49] ¶ 15; [54] ¶ 18; [56] ¶ 15. It was the scrub nurse's job to hand sterile instruments to the surgeon during the operation, *see* [45] ¶ 19; [54] ¶ 19, and both the scrub and circulating nurses would count at the beginning, middle, and end of each surgery all of the items used in the operating field, *see* [45] ¶ 22; [54] ¶ 22. Records of the counts performed during McCaster's March 2009 C-section revealed no anomalies or errors, and the operation, according to Dr. Jones, was routine and uneventful. *See* [45] ¶ 23; [49] ¶ 16; [54] ¶ 23; [56] ¶ 16. McCaster was discharged from the hospital a few days later, on March 27. *See* [45] ¶ 24; [54] ¶ 24.

McCaster claims that after her 2009 C-section, she began to experience heavy menstrual bleeding and intense pelvic pain. *See* [58] ¶ 9; [63] ¶ 9. The pain was especially bad each time her period started—so much so that it would bring her to her knees and reduce her to tears. *See id.* McCaster had an IUD put in in 2010, but she began to have vaginal discharge so she had it removed. The discharge continued, however (along with bleeding and the pain McCaster says she began to

6

experience after the 2009 C-section), until Dr. Sabnis removed the plastic pieces from McCaster's uterus in 2013. *See* [58] ¶¶ 10, 12; [63] ¶¶ 10, 12. None of the medical professionals present during the 2009 C-section recognized the plastic pieces recovered from McCaster's uterus or knew where they had come from. *See* [49] ¶ 18; [56] ¶ 18; *see also* [45] ¶¶ 26–27; [54] ¶¶ 26–27.

McCaster sued the United States of America under the Federal Tort Claims Act, claiming that Dr. Jones, a federal employee, had left the plastic in McCaster's uterus while performing the C-section in 2009. [9] at 1–6 (Counts I and II). In addition to her negligence claims against the government—which included both negligence and negligence under the theory of *res ipsa loquitur*—McCaster brought similar claims against Dr. Swords, *id.* at 6–12 (Counts III and IV), and Mercy Hospital (as vicariously liable for the actions of Dr. Swords and the nurses who assisted during the 2009 operation—collectively, the Mercy defendants), *id.* at 12–23 (Counts V through VIII).[4] The government moves for summary judgment on the FTCA claims. [47]. The Mercy defendants also move for summary judgment on the state-law claims asserted against them. [41].

## III. Analysis

McCaster's claims against Mercy Hospital and Dr. Swords are brought under Illinois law. Illinois law likewise governs McCaster's claims against the United

---

[4] In her amended complaint, McCaster refers to Dr. Jones as an agent of Mercy Hospital, *see, e.g.*, [9] at 14 ¶ 9; but McCaster has admitted at summary judgment that she does not have sufficient evidence to establish such agency, *see* [50] at 2. Thus, inasmuch as McCaster seeks to hold the hospital liable for certain individuals' actions, those individuals do not include Dr. Jones.

7

States. *See* 28 U.S.C. § 1346(b)(1) (basing FTCA liability on "the law of the place where the act or omission occurred"); *see also Buechel v. United States*, 746 F.3d 753, 763 (7th Cir. 2014); *Morisch v. United States*, 653 F.3d 522, 530 (7th Cir. 2011). To prevail on a claim of medical negligence in Illinois, the plaintiff must establish: (1) the standard of care in the medical community by which the physician's treatment was measured; (2) that the defendant deviated from that standard of care; and (3) that this deviation proximately caused the plaintiff's injury. *See Neade v. Portes*, 193 Ill.2d 433, 443–44 (2000) (citing *Purtill v. Hess*, 111 Ill.2d 229, 241–42 (1986)); *see also Wipf v. Kowalski*, 519 F.3d 380, 384 (7th Cir. 2008) (quoting *Jinkins v. Evangelical Hosps. Corp.* 336 Ill.App.3d 377, 783 N.E.2d 123, 126–27 (2002)). Unless the medical professional's negligence is so grossly apparent or the treatment at issue so common that it is considered to be within the common knowledge of a layperson, expert medical testimony is required to establish the relevant standard of care and any deviation from that standard. *Gulino v. Zurawski*, 43 N.E.3d 1102, 1123 (Ill. App. Ct. 2015) (citing *Sullivan v. Edward Hosp.*, 209 Ill.2d 100, 112 (2004); *Purtill*, 111 Ill.2d at 242); *see also Snelson v. Kamm*, 204 Ill.2d 1, 42 (2003) (explaining that, in general, the layperson is not equipped to determine what constitutes reasonable care in a given profession) (citation omitted).

Defendants here do not dispute that leaving plastic or other foreign objects in a patient's uterus during a medical procedure is a breach of the healthcare provider's duty of care (this is a matter of common sense). Nor do defendants dispute that the plastic left in McCaster's uterus was the proximate cause of the

8

pelvic pain, bleeding, and other symptoms for which she now seeks damages. The dispute in this case is over *who* breached the duty of care and caused the injuries.

A defendant's breach of duty may be established through direct evidence, but in cases where such evidence is primarily within the knowledge and control of the defendant, circumstantial evidence may be used. *See Heastie v. Roberts*, 226 Ill.2d 515, 531 (2007) (quoting *Metz v. Cent. Ill. Elec. & Gas Co.*, 32 Ill.2d 446, 448–49 (1965)). Plaintiffs seeking to prove negligence through circumstantial evidence are said to invoke the doctrine or principle of *res ipsa loquitur* (meaning "the thing speaks for itself"). *See id.*; *see also Imig v. Beck*, 115 Ill.2d 18, 26 (1986); *Aguirre v. Turner Constr. Co.*, 582 F.3d 808, 810–11 (7th Cir. 2009) (applying Illinois law). *Res ipsa* requires that the plaintiff show she was injured: (1) in an occurrence that ordinarily does not happen in the absence of negligence; and (2) by an agency or instrumentality within the defendant's exclusive control. *Heastie*, 226 Ill.2d at 531–32 (citing *Gatlin v. Ruder*, 137 Ill.2d 284, 295 (1990)); *see also Buechel*, 746 F.3d at 765 (applying Illinois law) (citations omitted). The court must determine whether the plaintiff has presented enough evidence to satisfy, or at least raise a question of fact as to, these elements. If the answer is "yes," the evidence is presented to the trier of fact, who is permitted—but not compelled—to draw from that evidence an inference of negligence. *See Gatlin*, 137 Ill.2d at 294–98; *Imig*, 115 Ill.2d at 27–29. The inference, if any, is weighed by the trier of fact against any contradictory evidence presented by the defendant. A strong inference of negligence will require

9

substantial proof from the defendant to overcome it, whereas a weak inference may be refuted by little contrary evidence or none at all. *See Imig*, 115 Ill.2d at 27–32.

Although McCaster has labeled her claims—and defendants have therefore addressed them—as either negligence or, separately, negligence based on *res ipsa loquitur*, *res ipsa* is simply a method of proving breach of duty. Given that defendants do not dispute the applicable standard of care or that leaving plastic behind after a C-section is a breach of that standard, McCaster's "negligence" and "*res ipsa*" claims are essentially one and the same. If defendants were responsible for failing to remove the plastic during the 2009 surgery, they were negligent. And if a question of fact exists as to *res ipsa*, then there is a question of fact as to breach generally.

Defendants argue that McCaster cannot prove negligence by *res ipsa loquitur* because she has not shown that the doctors and nurses present during her 2009 C-section had exclusive control of the plastic at issue. The control requirement is a flexible one; the key question "is whether the probable cause of the plaintiff's injury was one which the defendant was under a duty . . . to anticipate or guard against." *Heastie*, 226 Ill.2d at 532 (citing *Jones v. Minster*, 261 Ill.App.3d 1056, 1061 (1994); *Darrough v. Glendale Heights Cmty. Hosp.*, 234 Ill.App.3d 1055, 1060 (1992)); *Nichols v. City of Chicago Heights*, 31 N.E.3d 824, 842 (Ill. App. Ct. 2015) (citing *Heastie*, 226 Ill.2d at 532). That a defendant was responsible for the plaintiff's injury is proven by eliminating others' responsibility for that injury. *See Nichols*, 31

N.E.3d at 842 (citing *Lynch, v. Precision Mach. Shop, Ltd.*, 93 Ill.2d 266, 273 (1982)).

There is some evidence here that medical professionals other than defendants were responsible for McCaster's injuries. None of the doctors or nurses present during her 2009 C-section recognized the plastic that was ultimately found in her uterus, or had any idea where it had come from.[5] The attending nurses kept count of all items used in the operating field, and no discrepancies were found, *see* [45] ¶¶ 22–23; [54] ¶¶ 22–23, and Dr. Swords explained that either she or Dr. Jones would have visualized the uterus and removed from it all clots and debris before closing the cesarean incision, *see* [58] ¶ 14; [63] ¶ 14. Dr. Jones also testified that she would have ensured the surgical field was clear and no foreign objects had been left in the patient. *See* [49] ¶ 16; [56] ¶ 16.

---

[5] Dr. Fred Duboe, a board-certified specialist in obstetrics and gynecology (and McCaster's medical expert), opined that the plastic may have come from the adhesive film on the surgical drape, or the packaging for the final dressings. *See* [49] ¶ 49; [56] ¶ 49. But Len Czuba, a plastics engineer with experience in the medical-devices field (McCaster's plastics expert), inspected exemplars of the items used during the 2009 operation, and concluded that the plastic on the drape was different—in terms of thickness, finish, and opacity—than the plastic recovered from McCaster's uterus. *See* [49] ¶¶ 36–37; [56] ¶¶ 36–37. And the plastic bag containing the final dressings was thinner than the plastic discovered in her uterus in 2013. *See* [49] ¶ 30; [56] ¶ 30; Czuba Report, [49-7] at 4–5; September 22, 2015 Deposition of Len Czuba, [49-8] at 21, Tr. at 77:14–78:7. Czuba believed the plastic recovered from McCaster's uterus was likely excess material used to make the "containment pouch," a plastic pouch attached to the surgical drape to collect fluids during surgery, included by mistake in the packet of sterile items to be used during McCaster's procedure. *See* [45] ¶ 19; [49] ¶¶ 32, 35; [54] ¶ 19; [56] ¶¶ 32, 35; [58] ¶¶ 24, 29; [63] ¶¶ 24, 29; Czuba Deposition, [49-8] at 23–25, Tr. at 88:9–18, 90:8–91:19. (As Czuba explained at his deposition, however, the methods he used to reach this conclusion—examining the physical characteristics of the plastic—were crude in comparison to chemical testing methods that could have been performed, but were not performed, in this case. *See* [49-8] at 24–25, Tr. at 92:19–95:19.)

But McCaster has presented other evidence suggesting that the plastic, whatever its source, *must* have been left in her uterus during the 2009 C-section. According to Dr. Fred Duboe, McCaster's medical expert, the plastic from the specimen bag used during the 2003 appendectomy was different from the plastic found in McCaster's uterus; and, in any event, it is unlikely that any objects left in her abdominal cavity during the first procedure would have migrated through her uterine wall (a thick, dense muscle). *See* June 30, 2015 Report of Fred J. Duboe, M.D., [49-10] at 4; Duboe Deposition, [49-11] at 36, Tr. at 138:18–140:10. Dr. Sabnis observed that it was possible for plastic to have traveled from the abdominal cavity to McCaster's uterus during a later C-section, *see* Sabnis Deposition, [49-2] at 60, Tr. at 59:9–:18, but nothing in the record suggests that such a scenario was at all likely to occur. As far as may be gleaned from the record, no plastic was used during the abortion in 2005. *See* Duboe Report, [49-10] at 4. And both Dr. Sabnis and Dr. Duboe opined that it would have been difficult (albeit possible) for McCaster to get pregnant after the 2004 surgery if the plastic had been left in her uterus at that time. *See id.*; Duboe Deposition, [49-11] at 51, Tr. at 198:2–:7; *id.* at 49, Tr. at 192:6–:19 (explaining that the plastic would have made it difficult for an ovum to implant in the uterine wall); Sabnis Deposition, [49-2] at 35–36, Tr. at 34:24–35:10; [58] ¶ 21; [63] ¶ 21. Even if McCaster had managed to conceive despite the plastic, explained Dr. Duboe, defendants likely would have discovered it during the 2009 C-section, or at least have noticed a foreign body in one of the ultrasounds in advance of that surgery. *See* [49-10] at 4; [49-11] at 36, Tr. at 139:5–:10; [58] ¶ 31; [63] ¶ 31.

And McCaster says that she began to experience intense pain and heavy bleeding after the 2009 operation, which continued until the plastic was removed in 2013. *See* [58] ¶ 9; [63] ¶ 9. Viewed collectively, and in McCaster's favor, a trier of fact could reasonably infer from this evidence that the plastic was left in McCaster's uterus during the C-section in 2009.

Defendants dispute such an inference, pointing out discrepancies between the evidence just discussed and other facts in the record. McCaster's medical records, for example, reflect some reports of pain and bleeding or vaginal discharge after her 2004 C-section—indicating that perhaps the plastic was left in her uterus during that procedure. But these symptoms, which appeared shortly after the 2004 surgery and again in July 2005 (after she discontinued her birth control), were seemingly sporadic—not the kind of consistently heavy bleeding and intense discomfort that McCaster claims she suffered after the 2009 operation. Except for a post-operative report from March 30, 2009, however, defendants note that McCaster's medical records do not include any additional complaints of pain until February 2010, some eleven months after the procedure in question. *See* [58] ¶ 9; [63] ¶ 9; Duboe Deposition, [49-11] at 46–48, Tr. at 177:14–185:18. That McCaster didn't initially report her pain does not necessarily mean that she didn't experience it. And the conflict, if any, between her testimony of what occurred and what her records suggest may have happened is not one that may be resolved at summary judgment. To avoid summary judgment on her negligence claims, McCaster needed only to present evidence reasonably suggesting that it was defendants who controlled the

plastic pieces found in her uterus at the time they were left there. *See Gatlin*, 137 Ill.2d at 297–98. She has done that much.

*Napoli v. Hinsdale Hospital*, 213 Ill.App.3d 382 (1st Dist. 1991), and *Loizzo v. St. Francis Hospital*, 121 Ill.App.3d 172 (1st Dist. 1984)—on which defendants rely to show that the "control" element has not been satisfied here—are inapposite. In *Napoli*, the plaintiff discovered a cut on her leg during a hospital visit. *See* 213 Ill.App.3d at 384. The Illinois Court of Appeals held that *res ipsa loquitur* did not apply because, although it was possible the plaintiff's injury had been caused by hospital staff, it was equally likely she had sustained the injury before arriving. *See id.* at 389. In other words, the record clearly demonstrated that the time and cause of plaintiff's injury were unknown. *Id.* at 388. Here, however, the record is not so clear. There is evidence reasonably suggesting that the injury-causing plastic was left in McCaster's uterus during the 2009 C-section, not a prior procedure. The evidence is circumstantial, but an inference is nevertheless possible; and if the inference were drawn, then the time and cause of McCaster's injury would be known.

*Loizzo*, like McCaster's case, involved multiple instances of treatment by multiple healthcare providers, and the plaintiff in *Loizzo*, like McCaster, sued only some of those providers under *res ipsa loquitur*. But *res ipsa* was inapplicable in *Loizzo* because there was no suggestion that the named defendants (as opposed to the unidentified doctors) had had the requisite control, and the named defendants were from different medical facilities and had not acted jointly with one another.

*See* 121 Ill.App.3d at 178–80. Here, one could reasonably conclude that the named defendants—not other medical professionals—were responsible for McCaster's injuries, because there is evidence that the plastic was left behind in 2009, defendants were expected to clear the surgical field during the 2009 procedure (and had exclusive control of the patient during that operation), and defendants acted jointly with each other at that time.

Nor are McCaster's *res ipsa* claims doomed, as the government argues, because she did not name as a defendant the manufacturer of the containment pouch used during her surgery in 2009. McCaster's plastics expert, as discussed above at note 5, opined that the plastic found in McCaster's uterus probably came from excess containment-pouch material that was included by mistake in the packet of sterile items to be used during surgery (the "C-section pack"). A manufacturing error was also at issue in *Raleigh v. Alcon Laboratories, Inc.*, where the plaintiff suffered a fungal infection in his eye after undergoing lens-replacement surgery. 403 Ill.App.3d 863, 865 (1st Dist. 2010). The plaintiff in *Raleigh* sued under *res ipsa* the hospital where the surgery had been performed, but not the manufacturer of the artificial lens—an omission fatal to his claim, as he could not trace the source of the fungus to an instrument within the hospital's control. According to the plaintiff's own expert, it was more likely that the fungus had come from the lens itself, either from manufacturing or "postmanufacturing" (*i.e.*, packaging). *See id.* at 867, 869–70. In other words, the plaintiff in *Raleigh* failed to establish that his injury was the kind that normally would not have occurred absent negligence of the named

defendant. Not so here. Even if the plastic found in McCaster's uterus wound up in her C-section pack as a result of a manufacturing error, what of it? McCaster's point is that *no* objects should have been left in her body, and on that issue there is no disagreement. How the objects may have gotten into the C-section pack in the first place is immaterial.

McCaster may proceed with her *res ipsa* claims, and, as discussed above, this means that there is a question of fact as to the element of breach in her negligence claims. It is of course true that speculation and conjecture are inadmissible and cannot defeat summary judgment. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009); *Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir. 1989); *see also McCormick by McCormick v. Maplehurst Winter Sports, Ltd.*, 166 Ill.App.3d 93, 98 (2d Dist. 1988) ("[L]iability for negligence may not be based upon surmise or speculation as to what might have happened to cause [the] plaintiff's injury.") (citations omitted). But putting aside the inadmissible speculation about how the plastic ended up inside McCaster's uterus, there is sufficient admissible circumstantial evidence to suggest that, however it got there, the plastic was left behind by defendants at a time when they were responsible for and in control of any foreign objects at the surgical site. As unsatisfying as it may be to attempt to solve a mystery without explaining how the essential event happened, this is the very purpose of the *res ipsa* inference. McCaster may proceed to trial.

16

## IV. Conclusion

Defendants' motions for summary judgment, [41], [47], are denied.

ENTER:

_Manish S. Shah_
Manish S. Shah
United States District Judge

Date: 4/20/16